In the ESTATE OF Lyle MURPHY,
Deceased.

Louise MURPHY, Petitioner-Appellant,

v.

Max MURPHY, Individually and as
Executor of the Estate of Lyle
Murphy, Deceased,

and

Donna Walker, Respondents.

No. 13102.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 10, 1983.

Motion for Rehearing Overruled and to Transfer to Supreme Court Denied Dec. 5, 1983.

Application to Transfer Denied
Jan. 17, 1984.

E.C. Curtis, Farrington, Curtis, Knauer, Hart & Garrison, Springfield, for petitioner-appellant.

James E. Curry, Ava, for the Estate of Lyle Murphy.

Daniel P. Wade, Wade & Haden, Ava, for respondents Max Murphy and Donna Walker.

PREWITT, Judge.

Appellant elected to take against the will of her deceased spouse, Lyle Murphy. See § 474.160, RSMo 1978. Respondents, his children by a prior marriage and beneficiaries of the will, contended that she had waived her right to so elect by a written agreement signed eleven days following her marriage to Lyle Murphy. See § 474.220, RSMo 1978. See also, § 451.220–.240, RSMo 1978. Following nonjury trial, the trial court determined that the postnuptial agreement was valid and that by signing it appellant waived her right to elect to take against the will. It also found that she was estopped from now claiming that the postnuptial agreement is invalid and that she ratified it by following it and using it to her advantage in dealing with her own property.

Appellant contends that the trial court erred in finding that the postnuptial agreement barred her right of election because when the agreement was entered into there was no disclosure of the nature and extent of the rights of the parties to the agreement and no disclosure of the property interests and assets of the parties and because the consideration moving to appellant was not a fair consideration under the circumstances. She also contends that the trial court erred in finding that she was estopped because the elements of estoppel are not present and the agreement is void as against public policy or void ab initio, so that the defense of ratification and estoppel is not available to respondents.

■ We first discuss the basic principles of law involved in appellant's first contention. The rules applied to determine the validity of a waiver of the rights of a surviving spouse are unique and distinct from the requirements for the validity of an ordinary contract. See *Estate of Hosmer v. Hosmer,* 611 S.W.2d 32, 35 (Mo.App.1980). See also, Maus, Missouri Practice, Probate Law and Practice, § 70, § 1241. Contracts between competent spouses which are in effect mutual waivers of the estate of the other, are governed by statute. *In the Matter of Estate of Soper,* 598 S.W.2d 528, 535 (Mo.App.1980). The statute relevant here is § 474.220, RSMo 1978. It states:

"The right of election of a surviving spouse hereinbefore given may be waived before or after marriage by a written contract, agreement or waiver signed by the party waiving the right of election, after full disclosure of the nature and extent of the right, if the thing or the promise given to the waiving party is a fair consideration under all the circumstances. This written contract, agreement or waiver may be filed in the same manner as hereinbefore provided for the filing of an election."

■ Section 474.220 exclusively applies when there is a will and § 474.120, RSMo 1978, applies to intestate estates. *In re Adelman's Estate,* 377 S.W.2d 549, 553 (Mo. App.1964). Under these statutes no distinction is made whether the agreement is signed before or after the marriage. Decisions under either section are helpful in

construing the other as both embody similar principles developed by case law. *Estate of Hosmer v. Hosmer,* supra, 611 S.W.2d at 35, citing 4 Maus, Missouri Practice, Probate Law and Practice, § 1241.

The parties both rely primarily upon *Estate of Youngblood v. Youngblood,* 457 S.W.2d 750 (Mo. banc 1970). It appears to be the leading case applying § 474.220. It states that in general terms the statutory requisites of a valid waiver of the right to elect are: (1) that there be a full disclosure of the nature and extent of the right being waived; this requires disclosure of the nature and extent of the property interests of the prospective spouses, or knowledge equivalent to such disclosure; and (2) that there be a fair consideration under all the circumstances, which not only requires that there be such consideration as would support a simple contract, but further that the consideration moving to the spouse or prospective spouse surrendering marital rights be fair and equitable in the particular circumstances. 457 S.W.2d at 754–755.

We turn now to the facts as shown in the record before us. Appellant and Lyle Murphy were married on October 16, 1970. At that time he was 64 years old and appellant 45. Both appellant and Lyle Murphy had children from a previous marriage. They had no children during their marriage. Appellant's prior husband was a cousin of the deceased. Because of that, appellant and Lyle Murphy had known each other for several years before their marriage. Decedent's first wife died on July 16, 1970, and appellant's previous husband died on May 9, 1970.

Following their marriage appellant and decedent lived on decedent's 278-acre farm near Souder. On October 27, 1970, decedent and appellant entered into a written postnuptial agreement. There was no evidence of the circumstances surrounding the preparation or signing of the agreement. In the agreement each party relinquished all rights to the other's property, including any rights of inheritance or any claim to the estate of the other. The consideration recited was the mutual relinquishment of

these rights. The agreement has no recital or other reference regarding the right of election to take against a will and it does not state whether any disclosure of their property was made by either party to the other. The agreement was subsequently recorded in Ozark County where decedent's farm was located and in Wright County where appellant owned a house that she and her previous husband had lived in.

The trial court found that at the time of the marriage decedent owned the 278-acre farm, a $12,000 certificate of deposit at the Bank of Gainesville, a $775.50 savings account at the Bank of Gainesville, a $15,000 certificate of deposit at Citizens Bank of Ava, a $5,092 checking account at Citizens Bank of Ava, and other personal property valued at $6,570. The farm was valued by the trial court at $40,000 at the time of the marriage. It also determined that at the time of the marriage that appellant's house was worth $5,000 and her household furniture $800. Appellant also owned an antique and used furniture business which had been operated by her and her previous husband from their home or adjacent to their home and an automobile. There was no evidence of the value of the business and the automobile.

On August 7, 1970, decedent held a sale on his farm, at which time he sold his dairy cattle and other personal property. Appellant was at that sale. Appellant had also previously driven by the farm prior to the marriage. During the marriage appellant and decedent maintained separate checking accounts. In February of 1977, appellant sold her home as her separate property. Decedent did not join in the conveyance. Appellant kept the proceeds from the sale separate from the assets of decedent. On August 14, 1976, she sold personal property that she apparently had previous to the marriage and kept those funds in her and her daughter's name.

Appellant was not allowed, due to respondents' objection based on the dead man's statute, to testify whether the decedent had made disclosure to her of his assets or if she was made aware by him or in his presence

of her right to elect to take against a will. She was allowed to testify that at the time of the agreement she was not made aware of his assets from any other source and that she did not learn from "any source other than Mr. Murphy or anyone in his presence in October of 1970, what the legal rights of a widow were in the property of a deceased husband".

Decedent's will is not in the record before us, but the findings of the trial court state that the decedent left a will leaving all his assets to his children and that there was a codicil to it which referred to the post-nuptial agreement.

The trial court determined that appellant "knew or should have known facts sufficient to charge her with knowledge of Lyle Murphy's property at the time she signed the post nuptial contract". It made no finding regarding appellant's knowledge of the rights of a widow to elect to take against the will of her deceased husband. It determined that appellant was not defrauded or overreached in the agreement by decedent and that the mutual releases contained in the agreement preserving their respective estates for their children were "fair, equitable and reasonable consideration." The trial court also determined that as appellant used the postnuptial agreement to her advantage following the marriage, she ratified it and is estopped from now claiming it as invalid.

Section 474.220 first conditions the validity of a waiver of the right to elect to take against a will upon "full disclosure of the nature and extent of the right". This requires (1) "disclosure" or knowledge of the legal right of such an election, and (2) "disclosure" or knowledge of the property interests of the prospective spouses. *Estate of Youngblood v. Youngblood,* supra, 457 S.W.2d at 754. The latter is apparently required to make the knowledge of the right of election meaningful when considering whether to waive that right. Id., 457 S.W.2d at 756.

*Youngblood* may support respondents as to knowledge of the assets. There, the court held that the record shows that the widow had sufficient knowledge of her husband's property to enter into the agreement understandingly and with knowledge of what she stood to lose or gain. 457 S.W.2d at 758. However, *Youngblood* does not aid respondents as to disclosure of the rights of a widow to elect to take against a will. The question there was whether actual knowledge of the decedent's assets at the time of the agreement would eliminate the requirement of a disclosure of assets and whether the widow had such knowledge. There was no question as to her knowledge of the right of election to take against the will. Before she signed the agreement Mrs. Youngblood was fully informed by an attorney about the right of election, 457 S.W.2d at 753, and the opinion states that he "had carefully explained the nature of the rights she was giving up." 457 S.W.2d at 757.

As *Youngblood* states, § 474.220 requires that there be "full disclosure of the nature and extent of the right [of election]". 457 S.W.2d at 756. The record does not show that the right of election was ever disclosed or explained to appellant or was known by her prior to signing the agreement. Knowing assets without knowing the rights in those assets could be meaningless in making a decision to sign a postnuptial agreement. Respondents contend in their brief that appellant "had just went through the death of a husband where real estate and personal property was owned and knew or should have known she would inherit from Lyle if she did not sign the postnuptial agreement" and thus "knew her rights having just recently lost a spouse and inherited real and personal property from him." We do not think that because her previous husband died and she became sole owner of property that he or they owned, it establishes that she was aware of her rights to take against a will. There was no evidence that her prior husband had a will or that she in fact inherited the property from him. It may have been owned such that it became hers by survivorship.

The resolution of appellant's first contention depends on who has the burden of proof regarding the validity of the agree-

ment. If appellant had the burden to show that the agreement was not executed in accordance with § 474.220, to prevail she would have to show that she was not advised or otherwise aware of her rights to elect to take against the will. She made no such showing. If respondents had the burden to establish the validity of the agreement, to satisfy § 474.220 they would have to show that she was advised or aware of those rights. They did not so show.

Who has the burden of proof in this situation has not been clearly determined in Missouri and the cases elsewhere are not in accord. See the discussion in *Hosmer, supra,* 611 S.W.2d at 35–36 and the cases therein cited and discussed. See also, Comment, Antenuptial Contracts Determining Property Rights Upon Death or Divorce, 47 U.M.K.C.L.Rev. 31, 38–40 (1978). At least one court has indicated that the burden may be on the husband or his heirs if the "husband was a man of the world and the prospective bride relatively inexperienced" or on the wife if the "husband is a commonplace and elderly drab and the prospective bride a wordly-wise and winsome young woman". *Del Vecchio v. Del Vecchio,* 143 So.2d 17, 20–21 (Fla.1962). Whether these are valid distinctions we do not consider as there is no evidence in the record from which to make those determinations.

*Hosmer* states that where the existence of a marital agreement is pleaded as a defense to rights which a widow otherwise would have, and the persons relying upon it claim that it complies with the applicable statute, it is reasonable that the burden of proving the validity of the agreement should be upon them. It further states that mere introduction of the agreement would not satisfy that burden and that the factors of full disclosure and fair consideration, at least unless prima facie evident on the face of the instrument, must also be shown, otherwise the agreement falls short of satisfying the statute. 611 S.W.2d at 36. It was not necessary in *Hosmer* to reach a decision as to who had the burden of proof, but here it is, and we believe that the reasoning stated in *Hosmer* is correct. *Estate of Thrasher,* 651 S.W.2d 562 (Mo.App.1983),

held that the burden of proof was on the surviving spouse to prove the invalidity of the agreement. We have no quarrel with its holding but do not find it applicable here. It distinguishes *Hosmer* and is likewise distinguishable here as in *Thrasher* the agreement recited disclosure. No such recitals are present here.

We hold that respondents had the burden of proof of establishing that the agreement complied with § 474.220 and that they failed to show that appellant knew or was advised of her rights of election. Appellant's signature alone does not establish the validity of the agreement. The statute requires additional proof for its validity. That was not provided and appellant's first contention must be upheld.

Whether this type of an agreement should require more proof to establish its validity than an ordinary contract is not for us to say. The statute was based on case decisions. The case law apparently developed out of a concern that a spouse, primarily the wife, might be taken advantage of, and whether such protection is now necessary can be questioned. Case law gives courts flexibility to change with the times when justice requires it. However, here we are concerned with a statute and we are limited to following it.

We now discuss whether, even if the agreement was initially invalid, appellant is barred from contending that it is now invalid because of ratification or estoppel.

*Quint v. Quint,* 359 S.W.2d 29 (Mo. App.1962), decided on facts occurring before § 474.220 was effective, held that a wife could not be estopped to assert the invalidity of an antenuptial agreement because she dealt with her own property as she alone saw fit. We believe that *Quint* is still applicable here as similar rights are involved. Also, we must take the record as showing that appellant did not have knowledge of her rights in her spouse's property. Absent that knowledge, a spouse cannot ratify a marriage agreement or be estopped to claim it is invalid. *Mathis v. Crane,* 360 Mo. 631, 230 S.W.2d 707, 714 (1950):

The agreement must be held invalid. This writer does not believe that the result here is necessarily desirable, but that this court is compelled to so hold due to § 474.-220 and the record here.

The judgment is reversed and the cause remanded to the trial court for further proceeding based upon the postnuptial agreement being invalid and of no effect.

MAUS, P.J., concurs.

HOGAN, J., concurs specially and files concurring opinion.

HOGAN, Judge, concurring:

I concur in the result reached; I do so separately only because I believe the court's difficulties with the burden of proof are largely self-created and because I do not believe it is the allocation of the burden of proof which prevents development of the facts in this order of litigation.

In my view—and I stress that the views I express are solely my own—this opinion is not in conflict with *McQuate v. White,* 389 S.W.2d 206 (Mo.1965), nor with *Matter of Estate of Soper,* 598 S.W.2d 528 (Mo.App. 1980). In *McQuate,* the surviving spouse sought a declaration that an antenuptial agreement was void; in *Soper,* Mrs. Soper's administratrix sought a similar declaration. It should come as no surprise that a party seeking to annul or cancel an instrument has the burden of proof. See, e.g., *Cruwell v. Vaughn,* 353 S.W.2d 616, 624[1–6] (Mo. 1962); *Cull v. Pfeifer,* 307 S.W.2d 424, 428[6] (Mo.1957).

By contrast, in this case and in *Hosmer v. Hosmer,* 611 S.W.2d 32 (Mo.App.1980), the marriage settlement was, as put in *Hosmer,* 611 S.W.2d at 36, "pleaded as a defense," and ordinary rules allocating the burden of proof would place the burden to show the validity of the agreement upon the heirs of the deceased spouse. Even though there is no formal pleading in the probate court, § 472.080, as amended, Laws of Mo.1980, p. 450, the analogy to a pleading of waiver or

estoppel is quite clear. Both waiver and estoppel are affirmative defenses in ordinary civil actions, Rule 55.08, and there is no reason why the heirs of Lyle Murphy should not bear the burden of proving those defenses. The practice of allocating the burden of proof has had its critics,[1] but even those critics state it as a general rule that "[t]he pleadings therefore provide the common guide for apportioning the burdens of proof." McCormick on Evidence § 337, 785 (Clearly ed. 1972). Our courts have ordinarily followed the rule that the party asserting the affirmative of an issue has the burden of proof. *Brown v. Sloan's Moving & Storage Company,* 274 S.W.2d 310, 313 (Mo.1954). Therefore, the ordinary rules allocating the burden of proof would put the burden of showing the validity of the marriage settlement upon the heirs when the agreement is pleaded or presented as a waiver.

Of course, the real obscurant to the truth in these cases is not the burden of proof, but § 491.010, the Dead Man's Statute. Allocating the burden of proof is attractive in that the heirs of the deceased spouse are not disqualified by the statute. *McKee v. Downing,* 224 Mo. 115, 136–138, 124 S.W. 7, 15[14][15] (1909). The surviving spouse is disqualified, *Nowack v. Berger,* 133 Mo. 24, 35–37, 34 S.W. 489, 490–491[1], 31 L.R.A. 810 (1896), and what is more, the second or "administration" proviso of § 491.010 imposes an absolute disability to testify in a contract action concerning *anything* which occurred before the commencement of probate. See *Fellows v. Farmer,* 379 S.W.2d 842, 849–850 (Mo.App.1964); *Birdsong v. Estate of Ladwig,* 314 S.W.2d 471, 475[3] (Mo.App.1958). In *McQuate,* 389 S.W.2d at 212[6–10], the court recognized that the surviving spouse can make proof of invalidity only by indirection, holding that the court should have permitted the plaintiff to show the extent of her property immediately *after* the appointment of the executrices so it might be compared with the estate of the

---

1. See Cleary, Presuming and Pleading: An Essay on Juristic Immaturity, 12 Stan.L.Rev. 5, 11 (1959) ("Actually the reported decisions involving problems of allocation rarely contain any satisfying disclosure of the *ratio decidendi.*").

deceased spouse as shown by the inventory. Such valuations, the court held, were relevant only because they were the best available evidence.

To make my point with a cliche, I believe that by reallocating the burden in this type of case we only "[come] out by the same door where in [we] went."[2] When the validity of an antenuptial or postnuptial contract is put in issue, proof of its fairness or lack thereof can be made only by the most roundabout means unless the draftsman is available, as was the case in *Estate of Youngblood v. Youngblood,* 457 S.W.2d 750 (Mo. banc 1970), and in *Soper.* The deceased spouse's heirs are not testimonially hog-tied, as is the surviving spouse, but who is to suppose that the heirs will have been made privy to the deceased's confidential discussions with a stepmother or stepfather? Not I. Neither do I suppose the heirs' recollection will be any less tinged with self-interest than that of the disqualified spouse. Finally, I would note that marriage settlements are matters of equitable cognizance. *Estate of Youngblood,* 457 S.W.2d at 754, n. 1; *Matter of Estate of Soper,* 598 S.W.2d at 535 and n. 4. As I understand *Youngblood,* the ultimate inquiry is whether the surviving spouse against whom enforcement of the agreement is sought has been defrauded or overreached. *Youngblood,* 457 S.W.2d at 756. Overreaching is but a form of equitable fraud, and if it appears by any species of proof or by legitimate inference from the evidence that the surviving spouse has been overreached, because the provisions for him or her are inadequate, such proof:

"raises a presumption of fraud and concealment, throwing the burden of proving the absence of fraud and concealment upon the [surviving spouse] or those claiming under him ... and the contract and all circumstances attending its execution will be 'regarded with the most rigid scrutiny.'"

*Jones v. McGonigle,* 327 Mo. 457, 464, 37 S.W.2d 892, 894[3] (1931).

2. Rubaiyat of Omar Khayyam, Stanza 27 (Fitzgerald trans. 5th ed. 1889).

In principle, this case is governed by what was held in *Mathis v. Crane,* 360 Mo. 631, 643, 230 S.W.2d 707, 714 (1950). The case was tried on a theory of ratification and estoppel, but as held in *Mathis,* 360 Mo. at 643, 230 S.W.2d at 714, there can be no ratification or estoppel unless the facts are fully known to the party charged with ratification or estoppel. No such knowledge was made to appear, but with respect to my patient colleagues, I think we could have reached that conclusion without reallocating the burden of proof. I therefore concur.